UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　　Case No. 6:20-cr-35-Orl-78DCI
　　　　　　　　　　　　　　　　　)
CHRISTOPHER KEITH HELD,　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　　　　)
_____)

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Christopher Keith Held (Mr. Held), by and through the undersigned counsel, respectfully submits this sentencing memorandum for this Honorable Court's consideration. Mr. Held requests that this Court determine that a variance from the applicable guideline range is appropriate under 18 U.S.C. § 3553, and thus impose a sentence below the sentence advised by the United States Sentencing Guidelines.  In support thereof, Mr. Held states as follows:

## STATEMENT OF FACTS

*Procedural History*

1.　　　　On May 13, 2020, Mr. Held pled guilty, pursuant to a plea agreement, to the following offenses: (a) conspiracy to commit access device fraud, in violation of 18 U.S.C. § 371 and 18 U.S.C. § 1029(a)(1); (b) one count of access device fraud, in violation of 18 U.S.C. § 1029(a)(1); (c) one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1); (d) two counts of possession of device-making equipment, in

violation of 18 U.S.C. § 1029(a)(4); and (e) one count of possession of 15 of more counterfeit and unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3).  Docs. 41 & 52.

2.      Mr. Held's sentencing is currently scheduled for August 4, 2020.  Doc. 53.

*Advisory Guideline Calculation*

3.      The Presentence Investigation Report (PSR) prepared by the U.S. Probation Office calculates Mr. Held's total offense level as a level 21 with a criminal history category of III. PSR at ¶¶ 68, 75, & 108.  Thus, Mr. Held faces an advisory guidelines sentencing range of 46 to 57 months of imprisonment. *Id.* at ¶ 108.  In addition, Mr. Held's guilty plea to aggravated identity theft carries a minimum term of two years imprisonment to be imposed consecutively to the other counts in Mr. Held's plea agreement. *Id.* at ¶¶ 106, 107, 108.

4.      Mr. Held has raised an objection to the sentencing guidelines loss calculation in his PSR.  Specifically, Mr. Held asserts that the intended loss calculation in his PSR, which was based on U.S.S.G. § 2B1.1, cmt. n.3(F)(i), should not be used to determine his sentencing guidelines range.  Instead, Mr. Held maintains that the actual loss amount of $102,307 should be used to compute his sentencing range.  If this Court were to sustain Mr. Held's loss calculation objections, Mr. Held's offense level would be level 13, and his advisory guideline range of imprisonment would be 18 to 24 months, to be followed by 24 months of consecutive imprisonment.  In the alternative, Mr. Held requests a downward variance.   As set forth below, a total sentence of no more than 42 months

imprisonment for Mr. Held's offenses would be sufficient but not greater than necessary to satisfy the purposes of 18 U.S.C. § 3553(a).

## MEMORANDUM OF LAW

This memorandum establishes that a variance is warranted in Mr. Held's case pursuant to 18 U.S.C. § 3553, notwithstanding the calculation of the sentence determined by the advisory guideline range.  Specifically, Mr. Held's severe drug addiction, his lack of youthful guidance due to his mother's abandonment of him when he was a young child, and the gross overstatement of the seriousness of his offense, which resulted from the application of U.S.S.G. § 2B1.1, cmt. n.3(F)(i), compels a downward variance.

1. **Booker and its Progeny Provides the Court with the Discretion to Impose a Variance under 18 U.S.C. § 3553(a)**

Pursuant to *United States v. Booker,* 543 U.S. 220, 245-67 (2005), a court is now unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United States,* 518 U.S. 81 (1996)).

To guide a court's discretion, section 3553(a)(2), requires sentencing courts to consider not only the advisory guidelines range, but also the facts of a specific case through the lens of several factors, which are discussed below. *See* 18 U.S.C. § 3553(a)(1)-(7).  In addition, under 18 U.S.C. § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in the second paragraph of the statute.  *See United States v. Shortt*, 485 F.3d 243, 248 (4th Cir. 2007); *see also Pepper v. United States*, 562 U.S. 476 (2011) (a "sentencing judge's

overarching duty under § 3553(a) [is to] impose a sentence sufficient, but not greater than necessary"). As the following sections demonstrate, an advisory guideline sentence in this particular case would necessarily violate the requirement that a defendant's sentence be sufficient but not greater than necessary to satisfy the purposes of § 3553(a). As this memorandum establishes, the application of the relevant § 3553(a) factors to Mr. Held compels the imposition of a sentence of not more than 42 months imprisonment.

### 2. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The significance of the first § 3553 factor is its comprehension that a consideration of a defendant's criminal conduct cannot disregard the life he has led beyond his crime. As noted in *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (Rakoff, J.), the importance of considering a defendant's entire history reaches its pinnacle at the time of sentencing. *Id*. at 513–14.

*The History and Characteristics of the Defendant*

The tenet in *Adelson* that a defendant's criminal conduct must be measured against his overall life has resonance in the instant case. As an initial matter, the letters written by Mr. Held's family members and the family photographs attached hereto as *Exhibits A, B, C,* and *D,* respectively, demonstrate that Mr. Held is most certainly a redeemable person of worth and value. However, Mr. Held's life has also had its share of pain and suffering. When Mr. Held was eight years old, his mother abandoned him, his father, and his sister, and started a relationship with "another man." PSR at ¶¶ 88, 89; *see also* Letter from Keith Edward Held, attached hereto as *Exhibit A* & Letter from Michele Held, attached hereto as

*Exhibit B*.   Adding salt to the wound, Mr. Held's mother walked out on the family on Thanksgiving Day.   PSR at ¶¶ 88, 89; *see also Exhibit A*.

Prior to his mother's abandoning the family, Mr. Held was a "happy, sweet child," who was an honor roll student, and active in youth sports.   PSR at ¶ 100; *Exhibit A*; *Exhibit B*.   After his mother left, Mr. Held was "devastated," as the love and care of his mother was irreplaceable during his formative years.   *Exhibit A*.   To add insult to injury, once Mr. Held's mother was no longer a part of his daily life, she also neglected him and visited him infrequently.   PSR at ¶ 86; *Exhibit B*.   According to Mr. Held's aunt, this took its toll on Mr. Held's happiness as a child.   *Exhibit B*.

Mr. Held's father took on the burden of raising both Mr. Held and Mr. Held's sister as a single parent.   PSR at ¶¶ 88, 89; *Exhibit A*.   Mr. Held's father acknowledged that "his children were emotionally affected after being abandoned by their mother."   PSR at ¶ 89. Moreover, due to the long hours required by his father's work schedule, Mr. Held was often left unsupervised as a child.   PSR at ¶ 89.   Complicating matters further was the fact that Mr. Held suffered from Attention Deficit Hyperactivity Disorder (ADHD) as a child.   PSR at ¶¶ 95, 96.   This condition went untreated for most of Mr. Held's childhood.   PSR at ¶¶ 95, 96.   Specifically, Mr. Held's father refused to give his son any prescribed ADHD medications.   PSR at ¶ 96.

Mr. Held's lack of a structured home environment, coupled with his ADHD diagnosis, eventually manifested itself in Mr. Held struggling academically and behaving badly at school.   PSR at ¶ 100.   Mr. Held was placed into a special education program and was suspended numerous times for behavioral issues.   PSR at ¶ 100.   Not surprisingly, Mr.

Held's academic struggles continued for the remainder of his childhood.  He eventually dropped out of high school and never obtained his GED.  PSR at ¶ 101.

As an adult, Mr. Held's childhood issues have continued to haunt him.  He continues to have a strained and distant relationship with his mother, with whom he has had no contact for the past four years.  PSR at ¶ 86.  Mr. Held's mother has also refused to see any of Mr. Held's children, which has caused Mr. Held further emotional pain and torment.  *Id.*

A lack of youthful guidance and education, and abandonment by parents, such as Mr. Held experienced in his childhood, has been recognized as a mitigating factor when sentencing a defendant.  *See United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1993).  The letters of support attached hereto clearly demonstrate that Mr. Held's childhood was irreparably damaged after his mother abandoned him, and the lack of structure and guidance he received as a child only made matters worse for him.  Mr. Held's first cousin, Michael Held, succinctly summed up Mr. Held's situation as follows:

> . . . we remain tied to those earlier experiences together and the bond of a family that once was very [sic] also close, but has gradually disintegrated in many ways due to various divorces, alcoholism, and mental health issues. Like many, many people, family life was not always easy for us, though it hit some of us harder than others. It hit Chris harder than his sister, harder than me and his other cousins. Chris has always been very caring and sweet to his family and friends, as well as deeply emotional and, therefore, sometimes impulsive (as you no doubt know is often a consequence of a deeply emotional person), trying to survive and take care of himself despite a poor foundation, and without always thinking through the smartest ways to do that without negative consequences. He hasn't ever had good tools to function otherwise. There were reasons for this, experiences that he was never able to positively reconcile, reasons that were not always his fault by a long shot. It's a life, and a lot happens within it.

*See* Letter from Michael Held, attached hereto as *Exhibit C*.

Mr. Held's severe and long-term drug addiction is another strong mitigating factor that warrants a significant variance in this case.  In *United States v. Hendrickson*, 25 F. Supp. 3d 1166, 1178 (N.D. Iowa 2014), a district court found that a defendant's addiction to drugs might, in the appropriate case, warrant imposition of a sentence below the applicable guidelines range.  The *Hendrickson* court reasoned that addiction can mitigate a defendant's culpability because it "physically hijack[s] the brain" and "diminishes the addict's ability to evaluate and control his or her behaviors."  *Id.* at 1174.  Although the guidelines provide that "drug or alcohol dependence or abuse ordinarily is not a reason for a downward departure" a sentencing judge may rely on a defendant's drug addiction or other personal characteristics to impose a below guidelines sentence pursuant to 18 U.S.C. § 3553(a).  *Id.*, at 1178.

A district court may also grant an addiction-based variance even if the defendant is not an "exceptional addict." *See United States v. Parson*, 343 Fed. Appx. 163, 165 (8th Cir. 2009) (remanding a case for resentencing after "[t]he government concede[d] that a requirement of extraordinary circumstances to justify a sentence outside the advisory range is impermissible in light of [*Gall v. United States*, 552 U.S. 38 (2007)]" and that "the court [could] consider whether [the defendant's] drug addiction would justify a further downward variance under § 3553(a)").  A Middle District of Florida court has also recognized that:

> [T]here is no prohibition against factoring drug addiction into the § 3553 calculus. In fact, § 3553(a)(1) compels a sentencing court to take into account the "history and characteristics of the defendant."  For this reason, it is entirely appropriate to consider a defendant's drug addiction in fashioning an appropriate sentence.

*United States v. Cani*, 545 F. Supp. 2d 1235 (M.D. Fla. 2008) (Conway, J.) (internal citations omitted).

In 2014, Mr. Held started using unprescribed Adderall.  PSR at ¶ 97.  Undoubtedly, Mr. Held was likely struggling with his untreated ADHD and, possibly, other mental health issues attributable to the struggles he experienced in childhood.[1]  Mr. Held eventually developed a dependency on Adderall and needed the drug to maintain "a normal work-life balance."  *Id.*

Around this same time, in 2014, Mr. Held began a tumultuous and self-destructive relationship with Bonnie Brooke Vogt (Ms. Vogt), his co-defendant in the instant case. PSR at ¶ 91.  Eventually, both Mr. Held and Ms. Vogt developed a severe addiction to methamphetamine, one of the most harmful controlled substances in our society.  PSR at ¶ 97.  The powerful hold that this addiction had over the couple is well documented in this case and is clearly the sole motive behind their crimes.  On January 17, 2019, law enforcement seized a user amount of crystal methamphetamine from a Mercedes vehicle that Mr. Held and Ms. Vogt rented.  PSR at ¶ 29.  After Mr. Held's arrest on January 17, 2019, Mr. Held informed law enforcement that he and Ms. Vogt were addicted to methamphetamines and would commit crimes to pay for their addiction.  PSR at ¶ 31.  In fact, Mr. Held's drug addiction had been ongoing for the past seven years, and continued all the way up until his arrest in October of 2019, after which he was detained at the Orange

---

[1] On January 22, 2019, the Orange County Corrections Health Services Department observed that Mr. Held reported suffering from anxiety and nightmares. *See* Excerpt from the Orange County Corrections Health Services Department record for Mr. Held, attached hereto as *Exhibit D*.

County Jail.  PSR at ¶¶ 93, 97.  Mr. Held has acknowledged that his drug addiction "ruined his relationships, his employment, and his finances."  PSR at ¶ 97.  Because of his drug addiction, Mr. Held was reduced to "panhandling and illegal activities" in order to support himself.  PSR at ¶ 102.   By the time of his arrest in October of 2019, Mr. Held had spent seven years bouncing from hotel to hotel with Ms. Vogt.  PSR at ¶¶ 91, 93.  Mr. Held's addiction was so all consuming that he even "lost touch" with his father, with whom he had a very close relationship.  *Exhibit A*.

The impact of Mr. Held's long-standing substance abuse problems on his decision-making cannot be overstated.  While drug addiction has often been viewed as the result of a lack of willpower and character in the addict, experts generally agree that narcotic dependence is a form of mental illness.  *See* Nat. Instit. Of Drug Abuse, "Comorbidity: Addiction and Other Mental Illnesses" (Sept. 2010), attached hereto as *Exhibit E*.  Addiction is "a complex brain disease characterized by compulsive, at times uncontrollable drug craving, seeking, and use despite devastating consequences – behaviors that stem from drug-induced changes in brain structure and function."  *Id.*, at 1.

"[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."  *See California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring).   Like many who suffer from the disease of drug addiction in our society, Mr. Held did not receive substance abuse treatment until he reached rock bottom, after his arrest and incarceration in this case.

Medical records from the Orange County Corrections Health Services Department confirmed that Mr. Held tested positive for methamphetamine, amphetamines, and ecstasy, after his arrests on January 18, 2019 and October 29, 2019, respectively.  PSR at ¶ 99.  On January 22, 2019, the Orange County Corrections Health Services Department also observed that Mr. Held had never been treated for drug abuse, and that he reported smoking crystal meth several times a day.  *Exhibit D*.   After his October 2019 arrest, Mr. Held was placed into a detox treatment program at the Orange County Jail.  PSR at ¶ 99.  During Mr. Held's subsequent incarceration at the Orange County Jail, Mr. Held completed five months of a substance abuse program, however, Mr. Held was unable to complete the program because he became ineligible once he was arrested and detained by the federal government.  PSR at ¶¶ 54, 98.

It is abundantly clear that Mr. Held's long-term, untreated substance abuse issues contributed to his diminished ability to fully appreciate the consequences of his actions. Mr. Held's offenses were foolish, unsophisticated, and easily detected by law enforcement. As noted above, Mr. Held was arrested on two separate occasions for essentially committing the same crimes.  PSR at p. 2 & ¶¶ 46-49 & 81.  After Mr. Held's October 2019 arrest, he remained detained at the Orange County Jail until he was taken into federal custody and detained in the instant case on February 19, 2020.  PSR at p. 2.  After he fully accepted responsibility for his actions in this case, Mr. Held succinctly summed up how his drug addiction contributed to his inability to distinguish between right and wrong:

> Held stated that his severe drug addiction motivated him to commit the instant offense. He stated that he feels horrible for having committed this offense and for putting the victims through this unnecessary harm. The

> defendant indicated that he disappointed himself and his loved ones. He does not think he would have committed this offense if he was drug free.

PSR at ¶ 54.

Although Mr. Held's drug addiction does not excuse his culpability for the instant offenses, it does mitigate the blameworthiness for his actions.  That is, the degree of a defendant's blameworthiness "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or diminished capacity."  *See* Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?,* 89 Minn. L. Rev. 571, 590 (Feb. 2005).  Applying these factors to Mr. Held's circumstances underscores that his culpability or blameworthiness is mitigated by his long-standing drug addiction and his lack of guidance as a child.

### The Nature and Circumstances of the Offense

Mr. Held fully recognizes the seriousness of his offenses and, by pleading guilty to multiple felony counts, has accepted full responsibility for his conduct.  Mr. Held's acceptance of responsibility is further demonstrated by the fact that he cooperated with law enforcement during the investigation of his offenses.  As noted in the PSR, on two separate occasions, Mr. Held agreed to waive his *Miranda* rights and speak with law enforcement officers about his criminal conduct.  PSR at ¶¶ 31 & 48-49.  On both occasions, first in January of 2019, and then during a second interview in October of 2019, Mr. Held fully

11

admitted to his role in this access device fraud conspiracy.  *Id.*  Mr. Held even told law enforcement about the criminal activity of his co-conspirator.  *Id.*

After Mr. Held was charged by the government in the instant case, Mr. Held promptly agreed to plead guilty, thereby saving the government the time and expense of preparing for trial.  In addition, Mr. Held's early decision to plead guilty, allowed the Court to turn its attention and resources to other trials and proceedings, and prevented jurors from enduring the expense and hardship of a trial.  Mr. Held's prompt decision to plead guilty in the midst of the Coronavirus/COVID-19 pandemic should be given extra weight.   As this Court is well aware, the Coronavirus/COVID-19 has caused a significant backlog of trials in the Middle District of Florida.   Moreover, the government's resources were stretched thin, as many government employees, including AUSAs and federal agents, have been working from home, while simultaneously engaging in childcare responsibilities due to the school/day care closures caused by the pandemic.  Mr. Held could have attempted to game this unprecedented situation to his benefit.   Mr. Held did not do that.  Instead, he accepted responsibility for his actions early on in this case.

In addition to Mr. Held's contriteness, a deconstruction of the loss amount attributed to Mr. Held indicates that it grossly overstates the seriousness of his conduct.  Here, Mr. Held has received an additional 16 levels in his advisory guideline range because he was assigned a total loss amount of $1,563,307.04.  PSR at ¶¶ 51 & 59.  However, this loss amount is nothing short of legal fiction.   Mr. Held's loss amount has been driven upwards as a result of U.S.S.G. § 2B1.1, cmt. n.3(F)(i).  Using this provision of the sentencing guidelines, the government has taken the position that a $500 minimum loss

12

amount should be assigned to each one of the approximately 2,900 social security numbers stolen by Mr. Held's co-conspirator.  In weighing Mr. Held's overall culpability with respect to this loss amount, the Court should first consider the fact that it was Ms. Vogt, not Mr. Held, who stole the personal identification information (PII) of approximately 2,900 individuals.  PSR at ¶ 26.  In addition, Ms. Vogt's fingerprints, not Mr. Held's, were identified on critical pieces of evidence seized by law enforcement during the investigation of this case, including: (1) a camouflage notebook containing ledgers with the victims' PII; (2) a second notebook containing another ledger of PII; and (3) the card tray of an Enduro ID card printer.  PSR at ¶¶ 44-45 & 47.  Thus, Ms. Vogt appears to be the more culpable member of this conspiracy.  When the court considers the nature and circumstances of Mr. Held's offense, it should recognize the nature and extent of his actions, when compared to his co-conspirator.  Mr. Held's lesser involvement justifies a variance of some kind.

In addition, only an extremely small percentage of the stolen social security numbers were actually used to commit fraud in this case.  Specifically, the government's evidence has established that Mr. Held only used the PII of the following four individuals to conduct unauthorized transactions during the conspiracy: (1) T.A.; (2) L.N.; (3) P.S.; and (4) B.A.  PSR at ¶¶ 28, 31, 35, 37.  Thus, Mr. Held is only responsible for using less than 1% of the PIIs that Ms. Vogt stole at the beginning of the conspiracy.  Further, the use of this PII caused $102,307 in actual loss, which constitutes only 6.5% of the total loss amount attributed to Mr. Held in this case.  PSR at ¶ 51.  In sum, the reality of the loss actually caused by Mr. Held is far less significant than the sentencing guidelines loss amount attributed to him by virtue of § 2B1.1, cmt. n.3(F)(i).

As noted in his PSR objections, Mr. Held believes that the $500 minimum per access device should not apply in his case, because he was never truly capable of using all 2,900 social security numbers to commit fraud. *See United States v. Onyesoh*, 674 F.3d 1157, 1159 (9th Cir. 2012) (holding that the $500 minimum applies only to unauthorized devices that are "usable"). Far from a criminal mastermind, Mr. Held was a severe drug addict with minimal education. The reality of Mr. Held's limitations with respect to the PII in this case is borne out by the fact that he was only able to use an extremely small percentage (less than 1%) during the conspiracy, which lasted almost a year. Based on the foregoing, Mr. Held asserts that the actual loss amount of $102,307 should be used to compute his sentencing guidelines range.

Alternatively, Mr. Held asserts that the outrageous disparity between his actual loss amount and the total loss amount attributed to him justifies a significant downward variance. *See* U.S.S.G. § 2B1.1, cmt. n.21(C) ("There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases a downward departure may be warranted"); *see also United States v. Campbell*, 765 F.3d 1291, 1301 (11th Cir. 2014).

"[T]he inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss . . . . may lead to guideline offense levels that are, quite literally, off the chart." *Adelson*, 441 F. Supp. 2d at 509. Further, "the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without,

14

however, explaining why it is appropriate to accord such huge weight to such factors." *Id.* "In many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence. To a considerable extent, the amount of loss caused by this crime is a kind of accident, dependent as much on the diligence of the victim's security procedures as on [a defendant's] cupidity." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004)

"With their almost singular focus on loss amount, the guidelines sometimes are insufficiently sensitive to personal culpability." *United States v. Milne,* 384 F.Supp.2d 1309 (E.D. Wis. 2005). That is exactly what has happened in Mr. Held's case, where a strict application of the sentencing guidelines has grossly overstated the seriousness of the offense and failed to truly account for Mr. Held's personal culpability. When this happens, a downward variance or departure is called for. *See e.g. United States v. McBride*, 362 F.3d 360 (6th Cir. 2004) (in a bad check and bankruptcy scheme, remanded for district court to consider whether to depart downward under § 2B1.1, where the intended loss of over $1 million "substantially overstated" the actual loss of $800); *United States v. Oligmueller*, 198 F.3d 669 (8th Cir. 1999) (affirming district court's downward departure where an actual loss amount of $829,000 stemming from a false loan application overstated the risk to the defrauded bank, and therefore, actual loss figure of $58,000 was used to compute an offense level 11); *United States v. Broderson*, 67 F.3d 452 (2d Cir. 1995) (holding that the district court was within its discretion to depart seven levels downward in a contracts fraud case because, *inter alia*, the calculated loss "significantly overstated the seriousness of [the defendant's] conduct"); *see also United States v. Roen*, 279 F. Supp. 2d

986 (E.D. Wisc. 2003) (in a mail fraud scheme where the defendant wrote several bad checks on a closed account in an attempt to purchase various items, the intended loss amount was over $1.2 million, while the actual loss amount was only $19,000; the district court granted a nine level downward departure, largely as a discount for the "dramatic increase in offense level based on intended loss . . . [which] . . .bore little or no relation to economic reality."). Similar to *Roen*, Mr. Held's intended loss amount bears little to no relation to the economic reality of his offense. Therefore, a significant variance is justified in order to bring Mr. Held's sentence more in line with the actual harm he caused.

The Court should also revisit the context in which Mr. Held committed his crimes when weighing the nature and circumstances of his offense. Mr. Held was in the throes of a severe drug addiction when he committed his crimes. As noted above, this drug addiction significantly impacted Mr. Held's behavior and his ability to make good judgments.

**3.     The Need for the Sentence Imposed**

*A.     To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

It is undeniable that Mr. Held's offenses are serious, however, Mr. Held has made significant efforts to mitigate the harm caused by his offenses by cooperating with law enforcement after his arrests, agreeing to be interviewed on two separate occasions, answering all of law enforcement's questions truthfully during the interviews, and promptly pleading guilty in this case. It is also notable that Mr. Held's offenses did not involve violent conduct or firearms.

Additionally, after the Court imposes its sentence, Mr. Held will be a convicted felon for the first time in his life. Accordingly, this Court should also consider the

significant punishment of the collateral consequences that Mr. Held will be facing after his release from prison. A recent congressional report authored by the United States Government Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, Stakeholders Views on Potential, Actions to Address Collateral Consequences, (Sept. 2017), available at http://www.gao.gov/products/GAO-17-691.pdf, summary excerpt attached hereto as *Exhibit F*. Of these 641 collateral consequences, 497 (78%) of them may last a lifetime. *See id*.

Recognizing the effect of collateral consequences of a felony conviction, one district court has emphasized the need for federal judges to account for such an impact at sentencing *United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016) (Block, J.) (varying downward from guideline range of 33 to 44 months imprisonment to one-year of probation for a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon). *Nesbeth* concluded that "sufficient attention has not been paid at sentencing . . . to the collateral consequences facing a convicted defendant. And I believe that judges should consider such consequences in rendering a lawful sentence." *Id.*; see also Jeremy Travis, *Invisible Punishment: An Instrument of Social Exclusion, in Invisible Punishment: The Collateral Consequences of Mass Imprisonment* (Marc Mauer & Meda Chesney-Lind eds., 2002).

In granting a variance in *Nesbeth*, the court asserted that the collateral effects of a criminal conviction can be "devastating" to a defendant. *Nesbeth*, 2016 WL 3022073, at *1.

> Myriad laws, rules, and regulations operate to discriminate against ex-
> offenders and effectively prevent their reintegration into the mainstream
> society and economy. These restrictions amount to a form of 'civi[l] death'
> and send the unequivocal message that 'they' are no longer part of 'us.'

*Id.* (citing Michelle Alexander, *The New Jim Crow* (2010)).  As *Nesbeth* establishes, the civil death that Mr. Held now faces as a result of his convictions constitute significant punishment.

In sum, the seriousness of Mr. Held's offenses should be counterbalanced by his genuine efforts to accept responsibility and the collateral consequences he now faces, along with the other mitigating factors in his personal history and characteristics.

> **B.**     *To afford adequate deterrence to criminal conduct*

A below-guidelines sentence would afford adequate deterrence to Mr. Held.  As an initial matter, the principle of general deterrence is based on the now debunked premise that prison sentences deter crime.  The magnitude of this faulty conception is succinctly stated as follows:

> For the past 40 years, the United States has been engaged in a vast, costly
> social experiment.  It has incarcerated a higher percentage of its people, and
> for a longer period, than any other democracy. In fact, with 5 percent of the
> world's population, the U.S. is home to 25 percent of its prisoners.  There
> are five times as many people incarcerated today than there were in 1970. .
> . [The] archipelago of prisons and jails costs more than $80 billion annually
> — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder et al., *What Caused the Crime Decline?*, Brennan Center for Just., 22-23 (Feb. 12, 2015), available at https://www. brennancenter. org/publication/whatcaused-crime-decline.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and the reduction in crime.  *Id.*; *see also* Gary Kleck and

J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks:  Is There a "Collective Wisdom"?*, 59 Crime & Delinquency 1006, 1031-33 (2013).  Kleck and Barnes' study concludes:

> there is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.

*Id.* at 1031.  The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence.  *See* U.S. Dept. of Justice, *Nat'l Inst. of Justice, Five Things About Deterrence* (July 2014), attached hereto as *Exhibit G*.  In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter crime.  *Id.*

Because the concept of general deterrence has been proven to be a faulty conception, any argument that Mr. Held should receive a guidelines sentence in order to deter others from committing similar crimes must fail.

C.      *To protect the public from further crimes of the defendant*

As an initial matter, there is no correlation between recidivism and a lengthier term of imprisonment for Mr. Held.  The empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime.  *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016), attached hereto as *Exhibit H*; *see also* Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of*

*Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame"). In sum, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., P*risons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

In this regard, the 2016 study by the National Institute of Corrections establishes three critical tenets. First, incarceration has a negligible impact on crime prevention. *Exhibit H*, at 4. Instead, a longer prison sentence may actually lead to a greater risk of recidivism. *Id.* There is strong evidence that prison—by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders—leads to increased recidivism. *See The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Public Policy 589 (2007). Moreover, harsh penalties do not improve the long-term outcomes of the offender. *Exhibit H*, at 4. Finally, community correction programs are more effective in reducing recidivism. *Id.* at 5.

Based on the foregoing, a below-guidelines sentence would satisfy the sentencing factors of both specific and general deterrence.

   D. *To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.*

Mr. Held suffers from untreated ADHD as well as a long-term addiction to methamphetamines, for which he had never received treatment until his arrest and incarceration in this case. Currently, Mr. Held is not permitted to participate in substance abuse treatment at the Orange County Jail, based on his status as a federal detainee. However, Mr. Held will be eligible to participate in the Bureau of Prison's Residential Drug Abuse Program (RDAP), including receiving a sentence reduction upon successful completion of the program. *See* 18 U.S.C. § 3621(e). Mr. Held hereby requests that this Court recommend that he be placed into RDAP during his incarceration with the Bureau of Prisons. Notably, should Mr. Held receive this substance abuse treatment, any risk of recidivism that he poses upon his release would be greatly reduced.

   **4.** **The Kinds of Sentences Available and the Sentencing Guidelines**

The guidelines merely provide a "starting point" for the Court's sentencing considerations. *Gall*, 552 U.S. at 49; accord *Cunningham v. California*, 549 U.S. 270 (2007). As stated in *Gall*, district courts "may not presume that the Guidelines range is reasonable" and must make "an individualized assessment based on the facts presented." 552 U.S. at 50. Moreover, the Court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id.*, at 47. As this Court is well aware, the guidelines can produce sentencing ranges "greater than necessary to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007).

Here, the Court has the authority and discretion to impose a sentence of not more than 42 months imprisonment for Mr. Held.  Such a sentence would be warranted here, based on Mr. Held's lack of guidance as a youth, his mother's abandonment of him when he was a young child, his severe substance abuse problem, and the gross overstatement of the seriousness of his offense caused by the strict application of the guidelines in this case.

**5.     The Need to Avoid Unwarranted Disparities**

Regarding the goal of avoiding disparity in the sentences of defendants, Mr. Held submits that this factor strongly supports his request for a variance down to 42 months imprisonment.  In fiscal year 2019, sentences below the guideline range were imposed in just over 50% of all fraud/theft/embezzlement cases. *See* U.S. Sent'g Comm'n, 2019 Sourcebook of Federal Sentencing Statistics, tbl.31 & tbl. 36, attached hereto as Composite *Exhibit I.*[2]  Such a substantial number of departures and variances in fraud sentences reflects widespread judicial recognition that the advisory guideline range under § 2B1.1 often does not promote the goal of just sentencing. To further illustrate this judicial recognition, *Exhibit J* provides charts of fraud cases both nationally and in the Eleventh Circuit, many of which involved losses far greater than the alleged loss in this case.  In addition to these cases, two more recent sentences in the Middle District of Florida demonstrate that sentencing courts can vary downward in fraud cases, even when the sentencing guidelines loss is significant.  *See, e.g., United States v. Christensen*, Case No.

---

[2] *Exhibit I* demonstrates that out of the total 6,273 fraud/theft/embezzlement cases in 2019, there were a total of 1,052 downward departures, pursuant to U.S.S.G. §§ 5K1.1 and 5K3.1, and other departure grounds.  *Exhibit I* also shows total variances of 2,211 in these types of cases, only 104 of which were upward variances.  Thus, there were a total of 2,107 total downward variances in fraud/theft/embezzlement cases in 2019.

6:15-cr-00153-CEM-GJK (M.D. Fla. 2016) (imposing a sentence of one-year of imprisonment for a West Palm Beach physician convicted of defrauding Medicare out of $1,101,919); *United States v. Bramwell*, Case No. 6:17-cr-143-Orl-40DCI (M.D. Fla. 2018) (imposing a sentence of probation for a medical doctor convicted in a health care kickback conspiracy where the loss amount was $4.4 million to Tricare).[3]

Lastly, a number of recent access device fraud cases in the Middle District of Florida have resulted in sentences similar to or less than the sentence that Mr. Held requests herein. *See e.g. United States v. Menjivar*, Case No. 2:14-cr-00067-JES-DNF (M.D. Fla. 2015) (defendant received a sentence of three years imprisonment for possession of 15 or more unauthorized access devices and aggravated identity theft, where defendant possessed social security numbers, with the intent to file fraudulent income tax returns, and where approximately 16 income tax returns were electronically filed with the IRS using the PII); *United States v. Rojas*, Case No. 2:15-cr-00164-SPC-MRM (M.D. Fla. 2016) (defendant was sentenced to 45 months imprisonment for access device fraud and aggravated identity theft, where defendant used unauthorized credit card information at retail establishments to acquire items using the credit card information of others without lawful authority); *United States v. Scott*, Case No. 6:18-cr-00246-CEM-DCI (M.D. Fla. 2019) (defendant sentenced to 30 months imprisonment for access device fraud where defendant was part of a conspiracy to obtain PII from victims, obtain fake credit card accounts and cards in the victims' names, and use those credit cards to obtain goods, gift cards, and cash at retail

---

[3] The government has appealed this sentence and a decision on whether or not the sentence will be affirmed is still pending in the United States Court of Appeals for the Eleventh Circuit.

establishments and banks); *United States v. Reed*, Case No. 8:18-cr-00233-WFJ-SPF (M.D. Fla. 2020) (defendant received a sentence of 42 months imprisonment for theft of government funds and access device fraud, where defendant filed more than 100 fraudulent tax returns with the IRS using dozens of stolen identities); *United State v. Ulysse, et. al.*, Case No. 6:19-cr-238-Orl-41GJK (M.D. Fla. 2020) (access device fraud conspiracy involving three defendants who possessed a credit card printer, a card embosser, several credit card skimming and encoding devices, several counterfeit Florida ID cards, and a number of counterfeit credit cards; defendants received sentences ranging from 8 to 20 months imprisonment).

In light of these cases, as well as the national statistics demonstrating consistent and substantial variances in fraud cases, Mr. Held submits that a variance in his case is appropriate in order to avoid unwarranted sentencing disparities.

## CONCLUSION

Although Mr. Held has some criminal history, he has never committed a felony offense before the instant case. Mr. Held's federal arrest and prosecution has truly been a wakeup call for him. Mr. Held has already learned a great deal about himself and the disease of drug addiction that he suffers from. Mr. Held understands that he must serve some period of incarceration. He plans to use that time to participate in drug treatment and vocational training so that he can improve himself for his family, and especially, for his children. Mr. Held merely prays that this Court will show him mercy and impose a sentence of not more than 42 months imprisonment, which would be sufficient, but not greater than necessary to achieve the goals of sentencing. Additionally, Mr. Held requests

that this Court include a finding in his Judgment that his gained credit time be considered *nunc pro tunc* to October 29, 2019, the date when he was arrested by state authorities and began his detention at the Orange County Jail for the instant offenses.

Respectfully submitted this 28th day of July, 2020.

s/Andrew C. Searle
**ANDREW C. SEARLE, ESQ.**
Florida Bar No.  0116461
**SEARLE LAW P.A.**
200 East Robinson Street, Suite 1150
Orlando, Florida 32801
Telephone: 407-203-3715
Email: andrew@searle-law.com
Counsel for Defendant Christopher
Keith Held

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on July 28, 2020, I filed a copy of the foregoing with the Clerk of the Court via the CM/ECF system.  I further certify that all parties to this case are equipped to receive service of documents via that system.

s/Andrew C. Searle
**ANDREW C. SEARLE, ESQ.**