# Exhibit H




# myths & facts

## Why Incarceration Is Not the Best Way to Keep Communities Safe

Community Corrections Collaborative Network

The Community Corrections Collaborative Network (CCCN) is comprised of the leading associations representing 90,000-plus probation, parole, pretrial, and treatment professionals around the country, including the American Probation and Parole Association (APPA), the Association of Paroling Authorities International (APAI), the Federal Probation and Pretrial Officers Association (FPPOA), the International Community Corrections Association (ICCA), the National Association of Drug Court Professionals (NADCP), the National Association of Pretrial Services Agencies (NAPSA), and the National Association of Probation Executives (NAPE).

# Introduction

Given the rate of incarceration in the United States, policymakers and the public are increasingly aware of, and concerned about, the implications of crime policies resulting in the unnecessary use of incarceration. In fact, the United States is the world leader in per capita incarceration rates. More than 2.2 million adult men and women occupy cells in America's prisons and jails—a striking 910 adults for every 100,000 U.S. residents, or 1 out of every 110 adults (Glaze & Kaeble, 2014). The nation's high incarceration rate disproportionately impacts racial minorities: 1 out of every 15 black men ages 18 or older is behind bars (Pew Center on the States, 2008), and black males between the ages of 6 and 64 are five to seven times more likely to be incarcerated than white men of the same age (Carson & Sabol, 2012).

In 2014, more than 636,000 people were released from state and federal institutions (Carson, 2015)—approximately 1,750 per day—while another 11.4 million are processed through our local jails each year (Federal Interagency Reentry Council, 2015).

An even greater number of people are under correctional control in the community: in 2014, an estimated 4.7 million adults were on community supervision, or 1 in every 52 adults. Of these, more than 3.8 million were on probation and more than 855,000 were on parole or another form of post-release supervision (Kaeble, Maruschak, & Bonczar, 2015).

Crime also has significant fiscal impact. Considering the cost of state prison alone, the total taxpayer cost of 40 state prisons that participated in a 2011 study was $39 billion, or an average of $31,286 for each of the 1.2 million inmates in those states. The $39 billion cost is $5.4 million more than these states' combined $33.5 billion corrections budgets for prisons. It includes costs such as those for in-prison education and training programs, hospital and other health care for inmates, capital costs, employee benefits, and underfunded pensions and retiree health care benefits for corrections employees that, depending on the state, may be paid by other departments (Henrichson & Delaney, 2012).

Research suggests that incarceration does little to change a person's behavior. National studies (see, e.g., Durose, Cooper, & Snyder, 2014) indicate that 68% of state prisoners are rearrested within 3 years of their release, and 77% are rearrested within 5 years. Of those, nearly half—45%—are reincarcerated.

These high rates of rearrest and reincarceration translate to more victims, racial and ethnic disparities, an escalation of correctional and justice system costs, and a cycle of challenges for those who enter the justice system and struggle to stay out.

> Community corrections refers to agencies that supervise individuals who are in the community under the control of the justice system. These individuals include people who are released on pretrial supervision, those who participate in diversionary programs and services, those who are sentenced to a term of probation or other form of community supervision following their conviction, and those who are released from confinement under some form of parole or other form of post-release supervision.

Over the past three decades, researchers in the U.S., Canada, and abroad have conducted extensive studies in an effort to identify more effective ways to improve outcomes for those involved in the justice system. Indeed, while there remains much to understand about the pathways to criminal and delinquent behavior and the strategies that will result in desistance, there is much we do know about community corrections and effective interventions that reduce recidivism.

Based upon several decades of correctional research, community corrections agencies have made significant changes in the ways they manage those under their supervision. Researchers have identified strategies that produce positive results in terms of reducing recidivism. These research-based findings are referred to as "evidence-based principles," "evidence-based practices," "what works," and "effective interventions." At the core of these effective interventions are three principles: *risk, need,* and *responsivity*. The best outcomes are derived when community corrections implements these three principles with fidelity.[1]

> The term "risk," as used in the context of this paper, refers to the likelihood of any type of future criminal behavior, and should not be equated with risk of violence or dangerousness. Furthermore, risk of new criminal behavior and risk of violence/dangerousness should be distinguished from risk of failure in standard treatment.

- The "risk principle" holds that programming should be matched to a person's assessed level of risk to reoffend; those at higher risk need higher levels of intervention to reduce their likelihood of reoffense (see, e.g., Andrews & Bonta, 2010; Lowenkamp, Latessa, & Holsinger, 2006). It is important to point out that risk of failure in standard treatment is not the same as risk of violence or dangerousness. Research has also shown that offering services to individuals without regard to risk level generally fails to reduce recidivism and, particularly for low risk individuals, may actually result in increased recidivism (see, e.g., Andrews & Bonta, 2010; Lowenkamp, Latessa, & Holsinger, 2006; Lowenkamp, Latessa, & Smith, 2006; Lowenkamp, Pealer, Smith, & Latessa, 2006).

- The "need principle" states that, to reduce the likelihood of future illegal behavior, interventions should focus on those changeable traits (e.g., coping skills, use of alcohol/drugs) that influence criminal behavior rather than on those that do not. These crime-influencing risk factors are referred to as "criminogenic needs" (Andrews & Bonta, 2010; Andrews et al., 1990).

- The "responsivity principle" posits that the success of interventions depends on delivering them in ways that are most likely to engage people and facilitate meaningful change, and on matching the right program to the person based on his or her individual traits (see, e.g., Andrews & Bonta, 2010).

The number of people in this country involved with the criminal justice system—either in community corrections or incarcerated—places unsustainable burdens on the justice system. It is no wonder that criminal justice reform is a common topic of discussion among lawmakers, citizens, and justice system professionals alike. Despite the increased attention to the issue, many continue to hold beliefs about incarceration and community corrections that are not supported by research. This paper briefly explores some of the common myths about incarceration and community corrections and dispels those myths with research-informed facts.

---

[1] "Fidelity" is the degree to which an intervention is delivered as intended.

## Myth & Fact

### 1

**Myth 1: "The use of jail and prison is the best way to prevent crime."**

**Fact 1: While jail and prison do indeed prevent crime while people are incarcerated, once released, incarceration has, at best, a negligible impact on crime prevention and, at worst, is crime-producing.**

While a sentence of jail or prison removes individuals from the community and, in this regard, prevents crime against the general public through incapacitation, research is clear that incapacitating people is unlikely to deter them from committing crimes in the future. In fact, research suggests that, for many, the experience of being in jail or prison will actually increase the likelihood that they will reoffend following their confinement.

**Finding 1: Those confined to prison recidivate at a much higher rate than those sentenced to community corrections.** A review of empiricial studies by Durlauf and Nagin (2011) concluded: "The experience of imprisonment compared with non-custodial sanctions such as probation, sometimes called specific deterrence, does not seem to prevent reoffending. Instead, the evidence suggests the possibility of a criminogenic effect from imprisonment" (p. 14). Illustrating this conclusion, Bales & Piquero (2012) compared the recidivism patterns of 79,000 individuals convicted of felonies sentenced to a Florida state prison with the recidivism patterns of 65,000 people sentenced to a community-based program. Controlling for a range of variables (e.g., sex, race, age, index offense, criminal history, sentence recommendation) and applying multiple statistical techniques, the researchers determined that imprisonment was found to exert a crime-producing effect, with those who had been incarcerated recidivating at a much higher rate (15.4%) within 3 years of their release compared to those who were sentenced to community corrections.

**Finding 2: Incarceration can actually *increase* recidivism.** Jonson (2010) conducted a meta-analysis[2] of 85 studies examining the effects of custodial sanctions (i.e., jail, prison). The study controlled for a number of variables (e.g., age, risk level, etc.)[3] and determined that compared to nonincarcerative sentences (e.g., probation, home confinement, or diversion to treatment), custodial sanctions increased post-release offending by 14%. Moreover, placement in harsher confinement conditions (e.g., prison vs. residential programs) was associated with a 15% increase in recidivism.

**Finding 3: The vast majority of people in jails and prisons do not receive the treatment and services they need to live a crime-free lifestyle.** A report from the Bureau of Justice Statistics (James & Glaze, 2006) found that more than half of all prison and jail inmates had a mental health problem, but only 17%– 34% of them received mental health treatment following admission (34% of state prisoners, 24% of federal prisoners, and just 17% of jail inmates). In addition, of the 1.5 million inmates who met the DSM[4] criteria for

---

[2] A meta-analysis statistically averages the effects of an intervention across numerous studies that are all rated as being scientifically acceptable or strong.

[3] Controlling for variables is a critical step in research. Doing so enables researchers to compare, in the case of justice-involved individuals, the effects of different punishments, or sanctions, and other interventions on similarly situated individuals.

[4] The DSM, or Diagnostic and Statistical Manual of Mental Disorders, is the standard classification of mental disorders used by mental health and other health professionals in the United States and many other countries.

substance abuse or addiction, only 11% received any treatment during their incarceration (National Center on Addiction and Substance Abuse, 2010). This corresponds to more than 650,000 inmates released back into the community each year without having received these critical treatment services (National Institute on Drug Abuse, 2011).

**Finding 4: Harsh penalties do not improve long-term outcomes.** Gendreau and Goggin (1996) conducted a meta-analysis of more than 400 studies that examined the effects of punishment on recidivism. They found that harsher forms of punishment produced almost identical effects on recidivism as compared to reduced punishment or no punishment at all. In their review of the literature on punishment, Doob and Webster (2003) concluded the following: "Consistent with the findings of other comprehensive summaries, no convincing evidence was found to suggest that crime can be reduced by harsh sentences. It is true that one can never prove the absence of a phenomenon. However, the enormous efforts which have been expended over the past 30 years to find the opposite—that is, consistent deterrent effects [of harsher punishment]— have proven unsuccessful (Center of Criminology, University of Toronto, 2003, Item 1).

**Finding 5: Research on longer prison sentences is mixed; studies show increased recidivism under most circumstances.** In their meta-analysis of 117 studies involving 442,471 individuals, Smith, Goggin, and Gendreau (2002) determined that longer time periods in prison (in comparison to shorter time periods in prison) were associated with an *increase* in recidivism. These effects held when controlling for gender, adults versus juveniles, race, and risk levels. It should be noted that Meade, Steiner, Makarios, and Travis (2013) showed that prison terms of 5 or more years were associated with a reduction in the likelihood of recidivism; however, the authors acknowledge that "offenders who have served longer periods of time may simply have aged out[5] of crime by the time they are released" (p. 543). Jonson's meta-analysis of 85 studies (2010) found that sentence length was associated with greater recidivism for all types of offenders *with the exception of* sex offenders.

**Finding 6: Confinement for technical supervision violations[6] has been found to increase recidivism.** Drake & Aos (2012) conducted a study to determine the effects of various sanctions—ranging from verbal reprimands to confinement—used when individuals violate technical conditions of a community sentence (e.g., failing to report to their supervising officer, neglecting to pay legal financial obligations, etc.). After controlling for age, gender, race, and risk level, it was found that those who received confinement as a sanction were nearly 19% more likely to commit a felony offense in the follow-up period than those sentenced to community supervision.

---

[5] The risk of crime declines naturally as people age. This "aging out" phenomenon may be due to hormonal or neurological changes, brain maturation or degradation, physical infirmity, etc.

[6] "Technical violations" are rule infractions that are non-criminal matters, such as failing to appear for scheduled appointments, failing to comply with court-ordered treatment, etc.

**Myth & Fact**

## 2

**Myth 2: "Community corrections does not work."**

**Fact 2: Community corrections has been shown to be effective in reducing future criminal activity by 10 to 30%.**

Researchers have demonstrated that community corrections can greatly reduce the risk of recidivism, especially when strategies based on core correctional practices[7] and the risk/need/responsivity principles are used. According to the risk principle, more intensive levels of treatment are most effective with higher risk people; according to the need principle, intervention efforts should target multiple criminogenic needs; and according to the responsivity principle, effective interventions are those that are responsive to the motivation, cognitive ability, and other characteristics of the individual (Andrews, 2007; Andrews et al., 1990).

**Finding 7: Community supervision programs can reduce the risk of recidivism by 10 to 30%.**
A meta-analysis of more than 100 correctional programs and treatment research studies found that recidivism is reduced by 10 to 30% on average[8] when attention is paid to criminogenic needs (Andrews, 2007). In particular, studies consistently demonstrate the effectiveness of cognitive-behavioral treatments[9] (Andrews & Bonta, 2010; Lipsey, Landenberger, & Wilson, 2007). These strategies assist offenders with changing harmful thinking patterns and attitudes, as well as developing prosocial skills. Further, recidivism reduction effects have been determined to be greater when services and interventions are delivered in the community rather than in residential/institutional settings (Andrews, 2007).

**Finding 8: Treatment services can reduce recidivism by 10 to 30%.** A summary of 30 meta-analyses (McGuire, 2002) found that treatment reduces recidivism by 10%, with slightly better outcomes when services are matched to the individual's unique traits (i.e., when the responsivity principle is followed). Other studies have demonstrated stronger results—up to 30%—when medium and high risk individuals receive appropriate behavior changing programming (Andrews, 2007; Andrews & Bonta, 2010; Andrews, Bonta, & Wormith, 2006; Andrews & Dowden, 2007; Andrews, Dowden, & Gendreau, 1999; Bonta, 2007; Dowden, 1998; Gendreau, Goggin, & Little, 1996; Lipsey & Cullen, 2007).

**Finding 9: The use of core correctional practices delivered in the community contributes to recidivism reduction.** A meta-analysis (Dowden & Andrews, 2004) of several hundred studies found that better outcomes were achieved when core correctional practices—for example, effective modeling and reinforcing prosocial attitudes, teaching concrete problem solving skills, and building a professional relationship that allows for open communication and respect—were used, particularly in combination with the risk, need, and responsivity principles.

---

[7] "Core correctional practices" are evidence-based risk-reducing strategies that include developing a strong professional alliance with justice-involved individuals; modeling and reinforcing prosocial attitudes and behaviors; creating opportunities to teach concrete skills such as problem solving, impulse control, and anger management; allowing for practice and rehearsal of newly learned skills; and using reinforcers and responses to noncompliant behavior effectively.

[8] A meta-analysis reveals an average effect size. Effect size ranges are contingent upon the effectiveness of implementation.

[9] "Cognitive behavioral treatments" are programs and services that aim to help justice-involved individuals understand the relationship between their thoughts and beliefs, feelings, and behaviors, and to learn prosocial ways of thinking and behaving. Examples of such programs include Moral Reconation Therapy (MRT), Reasoning and Rehabilitation (R&R), and Thinking for a Change (T4C).

**Finding 10: Individuals supervised by probation officers who receive risk/need/responsivity training are reconvicted at lower rates than their untrained counterparts.** A study (Bonta et al., 2011) that evaluated the effectiveness of a training program for probation officers grounded in the rehabilitative model of intervention and the risk, need, and responsivity principles showed that, relative to a control group, probation officers in the training group spent more time focusing on criminogenic needs and proportionally less time discussing noncriminogenic needs and probation conditions. After a 2-year fixed follow-up period, individuals who were on the caseloads of the trained officers had a reconviction rate that was 15% lower than those on the caseloads of their untrained counterparts. In a subsequent study, Bonta and colleagues (2008) determined sharp reductions in recidivism (26.5%) when trained officers devoted 20 minutes or more of appointment time to addressing criminogenic needs.

## Myth & Fact

### 3

**Myth 3: "Community supervision is soft on crime."**

**Fact 3: Individuals under community supervision reported that "doing time" is easier than having to abide by their release requirements.**

Although most law-abiding individuals may regard treatment and community supervision as desirable alternatives to confinement, those engaged in criminal wrong-doing report otherwise. In fact, surveys suggest that some justice-involved individuals view community-based sanctions as more onerous than jail or prison.

**Finding 11: Treatment-oriented sanctions are perceived to be punitive by justice-involved individuals.** Various studies (see, e.g., Crouch, 1993; Petersilia & Deschenes, 1994; Spelman, 1995; Wood & Grasmick, 1999) have concluded that many law-breakers do not view jail as being substantially more punitive than community-based interventions, such as community service or electronic monitoring. A survey of probationers and parolees (Wodahl, Ogle, Kadleck, & Gerow, 2009) found that they viewed nonincarcerative, treatment-oriented responses—such as completing writing assignments, participating in treatment, or providing community service—substantially more punitive than jail. Another study found that "75% of offenders rated one or more intermediate sanctions[10] as more severe than an incarcerative sanction" (Spelman, 1995, p. 107).

**Finding 12: Repeat prison-goers are less likely to view prison as punitive.** Several studies (Crouch, 1993; May & Wood, 2005; May, Wood, Mooney, & Minor, 2005; Wood & May, 2003) have demonstrated that those who have had repeat experiences with prison confinement view prison as less punitive than those with less prison experience.

---

[10] "Intermediate sanctions" are non-custodial justice system responses such as halfway houses, home confinement, and intensive supervision.

**Myth & Fact**

## 4

**Myth 4: "Crime victims don't support rehabilitation and treatment."**

**Fact 4: Crime victims do not want new victims and support rehabilitation, perhaps even more so than the general public.**

Justice system decision makers at both the policy and individual case level are informed by many factors, including and especially the public's view on crime and punishment. To be sure, policy- and decision-makers seek to advance the interests of the public in general, and the victims of crime specifically. In this regard, the opinions and perspectives of the general citizenry, alongside those of crime victims, create a fundamentally important context for these decisions. Contrary to the perception that those who perpetrate crime should be "put away," the majority of the American public favors community corrections for those who commit non-violent crime and generally support rehabilitative approaches.

**Finding 13: A majority of the American public favors alternatives to incarceration.** Eighty-seven percent of respondents in one national survey indicated they would be more likely to support alternatives to incarceration for non-violent justice-involved individuals (40% when it comes to a violent crime) if research consistently showed there are ways other than incarceration to reduce the likelihood that they will commit new crimes (National Institute of Corrections [NIC], n.d.). A review of more than 50 public opinion research studies conducted since 2000 demonstrates growing and broad support for alternatives to incarceration, rehabilitation, and treatment (Opportunity Agenda, 2014). Eighty-four percent of respondents from one study support alternatives to prison (such as drug treatment, community service, or probation) for nonviolent offenses (Lake, Gotoff, & Pultorak, 2013).

**Finding 14: The public favors spending resources on rehabilitative services.** Seventy-four percent of respondents in a national survey agreed with the statement "We should increase spending on approaches proven to reduce the chances that offenders will commit new crimes" (NIC, n.d.). Over 90% of respondents in a national public opinion poll felt that job training, drug treatment, mental health services, family support, mentoring, and housing should be offered to prisoners (Krisberg & Marchionna, 2006).

**Finding 15: Fifty-one percent of U.S. voters believe too many people are in prison.** According to a report published by The Opportunity Agenda (2014), most U.S. voters agree that the country relies too heavily on incarceration.

**Finding 16: Crime survivors are more likely than the general citizenry to support rehabilitation.** According to a study conducted by Peter D. Hart Research Associates, Inc. (2002), 60% of crime victims compared to 52% of those who were not crime victims said that prevention and rehabilitation should be the top goal of the justice system. In addition, nearly three-quarters of surveyed crime survivors (73%, compared to 64% of those who were not crime victims) indicated that the best way to reduce crime is through rehabilitation.

**Finding 17: By large majorities, victims specifically prefer investments in mental health, drug treatment, and supervised probation over incarceration.** In a survey of more than 2,300 California crime victims (Californians for Safety and Justice, 2013), more victims say that "too many" people are sent to prison rather than "too few." Victims participating in this study further indicated that they wanted a focus on supervised probation and rehabilitation by a 2:1 margin over prisons and jails. Investments in mental health and drug treatment were preferred by victims by a 7:1 margin over incarceration.

## Myth & Fact

### 5

**Myth 5: "Effective community corrections programs are expensive."**

**Fact 5: The more communities invest in effective treatment, social services, and community supervision, the greater their financial return on investment.**

Not only do community corrections programs achieve better results and have greater public and victim support, but they also cost significantly less than incarceration and demonstrate a greater return on investment.

**Finding 18: The cost of state prison is 10 to 20 times greater than the cost of community corrections.** In a study of 33 states, the average prison inmate cost was $79/day (or nearly $29,000/year), while the average cost for managing individuals in the community was $3.42/day for probation supervision and $7.47/day for parole supervision (or about $1,250 to $2,750/year, respectively; Pew Charitable Trusts, n.d.). Similarly, in the U.S. federal system, the cost of prison confinement is eight times greater than the cost of community supervision. In 2012, the annual cost of housing an inmate in federal prison was just under $29,000 compared to just over $3,200 to provide federal probation supervision services (United States Courts, 2013).

**Finding 19: The net value of the average targeted, evidence- and community-based adult correctional program is $11,150[11] per adult offender.** Washington State Institute for Public Policy (WSIPP; 2016) has conducted research to help policy-makers identify strategies that deliver better outcomes per dollar of taxpayer spending. Twenty-five community-based programs were evaluated to determine return on investment. Net values (the cost of an intervention less the savings derived from preventing future crime) were computed using a cost/benefit formula. Benefits minus costs ranged from +$188 to $26,863 per participant, and the benefit per $1.00 of cost ranged from a low of $1.18 to a high of $24.19.

**Finding 20: The financial benefits of some community-based programs and services has a 100% likelihood of outweighing their costs.** A cost–benefit review of evidence-based and research-based programs for adult community corrections showed, among other findings, that cognitive-behavioral treatment has a total per participant benefit of $10,050; outpatient/non-intensive drug treatment has total benefits of $14,125; and risk, need, and responsivity supervision for high and moderate risk offenders has total benefits of $12,121, with each of these services determined to have a 100% likelihood that benefits will exceed costs (WSIPP, 2016).

---

[11] Calculation based upon the average "Total Benefits Minus Costs" of evaluated community-based programs.

## 5 Facts, 1 Bottom Line

| | |
|---|---|
| 1 | While jail and prison do indeed prevent crime while people are locked up, once released, incarceration has, at best, a negligible impact on crime prevention and, at worst, is crime-producing. |
| 2 | Community corrections has been shown to be effective in reducing future criminal activity by 10 to 30%. |
| 3 | Individuals under community supervision reported that "doing time" is easier than having to abide by their release requirements. |
| 4 | Crime victims do not want new victims and support rehabilitation, perhaps even more so than the general public. |
| 5 | The more communities invest in effective treatment, social services, and community supervision, the greater their financial return on investment. |

**The bottom line:**

While incarceration serves as an important public safety tool for some, community corrections options produce more effective and less expensive results for many.

# References
Andrews, D. A. (2007). Principles of effective correctional programs. In L. L. Motiuk & R. C. Serin (Eds.), *Compendium 2000 on effective correctional programming.* Retrieved from Correctional Service Canada website: http://www.csc-scc.gc.ca/text/rsrch/compendium/2000/index-eng.shtml

Andrews, D. A., & Bonta, J. (2010). *The psychology of criminal conduct* (5th ed.). Cincinnati, OH: Anderson.

Andrews, D. A., Bonta, J., & Wormith, J. S. (2006). The recent past and near future of risk and/or need assessment. *Crime & Delinquency, 52,* 7–27. http://dx.doi.org/10.1177/0011128705281756

Andrews, D. A., & Dowden, C. (2007). The risk-need-responsivity model of assessment and human service in prevention and corrections: Crime-prevention jurisprudence. *Canadian Journal of Criminology and Criminal Justice, 49,* 439–464. http://dx.doi.org/10.3138/cjccj.49.4.439

Andrews, D. A., Dowden, C., & Gendreau, P. (1999). *Clinically relevant and psychologically informed approaches to reduced reoffending: A meta-analytic study of human service, risk, need, responsivity, and other concerns in justice contexts* (Unpublished manuscript). Ottawa, Canada: Carleton University.

Andrews, D. A., Zinger, I., Hoge, R. D., Bonta, J., Gendreau, P., & Cullen, F. T. (1990). Does correctional treatment work? A clinically relevant and psychologically informed meta-analysis. *Criminology, 28,* 369–404. http://dx.doi.org/10.1111/j.1745-9125.1990.tb01330.x

Bales, W. D., & Piquero, A. R. (2012). Assessing the impact of imprisonment on recidivism. *Journal of Experimental Criminology, 8,* 71–101. http://dx.doi.org/10.1007/s11292-011-9139-3

Bonta, J. (2007). Offender assessment: General issues and considerations. In L. L. Motiuk & R. C. Serin (Eds.), *Compendium 2000 on effective correctional programming.* Retrieved from Correctional Service Canada website: http://www.csc-scc.gc.ca/005/008/compendium/2000/chap_4-eng.shtml

Bonta, J., Bourgon, G., Rugge, T., Scott, T.-L., Yessine, A. K., Gutierrez, L., & Li, J. (2011). An experimental demonstration of training probation officers in evidence-based community supervision. *Criminal Justice and Behavior, 38,* 1127–1148. http://dx.doi.org/10.1177/0093854811420678

Bonta, J., Rugge, T., Scott, T.-L., Bourgon, G., & Yessine, A. K. (2008). Exploring the black box of community supervision. *Journal of Offender Rehabilitation, 47,* 248–270. http://dx.doi.org/10.1080/10509670802134085

Californians for Safety and Justice. (2013). *California crime victims' voices: Findings from the first-ever survey of California crime victims and survivors.* Retrieved from http://libcloud.s3.amazonaws.com/211/72/d/228/2/VictimsReport_07_16_13.pdf

Carson, E. A. (2015, September). *Prisoners in 2014* (NCJ 248955). Retrieved from Bureau of Justice Statistics website: http://www.bjs.gov/content/pub/pdf/p14.pdf

Carson, E. A., & Sabol, W. J. (2012, December). *Prisoners in 2011* (NCJ 239808). Retrieved from Bureau of Justice Statistics website: http://www.bjs.gov/content/pub/pdf/p11.pdf

Center of Criminology, University of Toronto. (2003, December). The imposition of harsher sentences does not deter crime [Highlight of the paper "Sentence Severity and Crime: Accepting the Null Hypothesis" by A. N. Doob & C. M. Webster in *From Crime and Justice: A Review of Research,* edited by M. Tonry]. *Criminological Highlights, 6*(2), Item 1.

Crouch, B. M. (1993). Is incarceration really worse? Analysis of offenders' preferences for prison over probation. *Justice Quarterly, 10,* 67–88. http://dx.doi.org/10.1080/07418829300091711

Doob, A. N., & Webster, C. M. (2003). Sentence severity and crime: Accepting the null hypothesis. In M. Tonry (Ed.), *From crime and justice: A review of research* (Vol. 30, pp. 143–195). Chicago, IL: University of Chicago Press.

Dowden, C. (1998). *A meta-analytic examination of the risk, need and responsivity principles and their importance within the rehabilitation debate* (Unpublished master's thesis). Ottawa, Canada: Carleton University.

Dowden, C., & Andrews, D. A. (2004). The importance of staff practice in delivering effective correctional treatment: A meta-analytic review of core correctional practice. *International Journal of Offender Therapy and Comparative Criminology, 48,* 203–214. http://dx.doi.org/10.1177/0306624x03257765

Drake, E. K., & Aos, S. (2012). *Confinement for technical violations of community supervision: Is there an effect on felony recidivism?* (Document No. 12-07-1201). Retrieved from Washington State Institute for Public Policy website: http://www.wsipp.wa.gov/ReportFile/1106

Durlauf, S. N., & Nagin, D. S. (2011). Imprisonment and crime: Can both be reduced? *Criminology & Public Policy, 10,* 13–54. http://dx.doi.org/10.1111/j.1745-9133.2010.00680.x

Durose, M. R., Cooper, A. D., & Snyder, H. N. (2014, April). *Recidivism of prisoners released in 30 states in 2005: Patterns from 2005 to 2010* (NCJ 244205). Retrieved from Bureau of Justice Statistics website: http://www.bjs.gov/content/pub/pdf/rprts05p0510.pdf

Federal Interagency Reentry Council. (2015, August). *Overview.* Retrieved from https://csgjusticecenter.org/wp-content/uploads/2014/05/FIRC_Overview.pdf

Gendreau, P., & Goggin, C. (1996). Principles of effective programming with offenders. *Forum on Corrections Research, 8*(3), 38–40.

Gendreau, P., Goggin, C., & Little, T. (1996). *Predicting adult offender recidivism: What works!* (User Report No. 1996-07). Ottawa, Canada: Solicitor General of Canada.

Glaze, L. E., & Kaeble, D. (2014). *Correctional populations in the United States, 2013* (NCJ 248479). Retrieved from Bureau of Justice Statistics website: http://www.bjs.gov/content/pub/pdf/cpus13.pdf

Henrichson, C., & Delaney, R. (2012, July 20). *The price of prisons: What incarceration costs taxpayers.* Retrieved from Vera Institute of Justice website: http://archive.vera.org/sites/default/files/resources/downloads/price-of-prisons-updated-version-021914.pdf

James, D. J., & Glaze, L. E. (2006, September). *Mental health problems of prison and jail inmates* (NCJ 213600). Retrieved from Bureau of Justice Statistics website: http://www.bjs.gov/content/pub/pdf/mhppji.pdf

Jonson, C. L. (2010). *The impact of imprisonment on reoffending: A meta-analysis* (Doctoral dissertation). Retrieved from https://etd.ohiolink.edu/!etd.send_file?accession=ucin1285687754&disposition=inline

Kaeble, D., Maruschak, L., & Bonczar, T. P. (2015) *Probation and parole in the United States, 2014* (NCJ 24907). Retrieved from Bureau of Justice Statistics website: http://www.bjs.gov/content/pub/pdf/ppus14.pdf

Krisberg, B., & Marchionna, S. (2006, April). *Attitudes of US voters toward prisoner rehabilitation and reentry policies.* Retrieved from National Council on Crime and Delinquency website: http://www.nccdglobal.org/sites/default/files/publication_pdf/focus-reentry-and-rehab.pdf

Lake, C., Gotoff, D., & Pulotrak, K. (2013). *Reducing incarceration levels in the U.S.: Opportunities for reform.* New York, NY: Open Society Foundations.

Lipsey, M. W., & Cullen, F. T. (2007). The effectiveness of correctional rehabilitation: A review of systematic reviews. *Annual Review of Law and Social Science, 3,* 297–320. http://dx.doi.org/10.1146/annurev.lawsocsci.3.081806.112833

Lipsey, M. W., Landenberger, N. A., & Wilson, S. J. (2007). *Effects of cognitive-behavioral programs for criminal offenders* (Campbell Collaboration Systematic Reviews 2007-06). Retrieved from www.campbellcollaboration.org/lib/download/143/

Lowenkamp, C. T., Latessa E. J., & Holsinger, A. M. (2006). The risk principle in action: What have we learned from 13,676 offenders and 97 correctional programs? *Crime and Delinquency, 52,* 77–93. http://dx.doi.org/10.1177/0011128705281747

Lowenkamp, C. T., Latessa, E. J., & Smith, P. (2006). Does correctional program quality really matter? The impact of adhering to the principles of correctional intervention. *Criminology and Public Policy, 5,* 201–220. http://dx.doi.org/10.1111/j.1745-9133.2006.00388.x

Lowenkamp, C., Pealer, J., Smith, P., & Latessa, E. (2006). Adhering to the risk and need principles: Does it matter for supervision-based programs? *Federal Probation, 70*(3). Retrieved from United States Courts website: http://www.uscourts.gov/statistics-reports/publications/federal-probation-journal/federal-probation-journal-december-2006

May, D. C., & Wood, P. B. (2005). What influences offenders' willingness to serve alternative sanctions? *Prison Journal, 85,* 145–167. http://dx.doi.org/10.1177/0032885505276988

May, D. C., Wood, P. B., Mooney, J. L., & Minor, K. I. (2005). Predicting offender generated exchange rates: Implications for a theory of sentence severity. *Crime & Delinquency, 51,* 373–399. http://dx.doi.org/10.1177/0011128704271459

McGuire, J. (2002). Integrating findings from research reviews. In J. McGuire (Ed.), *Offender rehabilitation and treatment: Effective practice and policies to reduce re-offending.* Chichester, UK: Wiley.

Meade, B., Steiner, B., Makarios, M., & Travis, L. (2013). Estimating a dose–response relationship between time served in prison and recidivism. *Journal of Research in Crime and Delinquency, 50,* 525–550. http://dx.doi.org/10.1177/0022427812458928

National Center on Addiction and Substance Abuse. (2010, February 26). New CASA report finds: 65% of all U.S. inmates meet medical criteria for substance abuse addiction, only 11% receive any treatment. Retrieved from http://www.centeronaddiction.org/newsroom/press-releases/2010-behind-bars-II

National Institute of Corrections. (n.d.). *Evidence-based decision making in the criminal justice system: Key findings from a national public opinion survey.* Retrieved from http://ebdmoneless.org/wp-content/uploads/2015/12/EBDM-Public-Opinion-Fact-Sheet.pdf

National Institute on Drug Abuse. (2011, May). *Treating offenders with drug problems: Integrating public health and public safety.* Retrieved from http://www.ndcrc.org/content/treating-offenders-drug-problems-integrating-public-health-and-public-safety

Opportunity Agenda. (2014). *An overview of public opinion and discourse on criminal justice issues.* Retrieved from http://opportunityagenda.org/files/field_file/2014.08.23-CriminalJusticeReport-FINAL_0.pdf

Peter D. Hart Research Associates, Inc. (2002, February). *Changing public attitudes toward the criminal justice system.* Retrieved from Open Society Foundations website: https://www.opensocietyfoundations.org/sites/default/files/Hart-Poll.pdf

Petersilia, J., & Deschenes, E. P. (1994). Perceptions of punishment: Inmates and staff rank the severity of prison versus intermediate sanctions. *Prison Journal, 74,* 306–328. http://dx.doi.org/10.1177/0032855594074003003

Pew Center on the States. (2008). *One in 100: Behind bars in America.* Retrieved from http://www.pewtrusts.org/~/media/legacy/uploadedfiles/wwwpewtrustsorg/reports/sentencing_and_corrections/onein100pdf.pdf

Pew Center on the States. (2009). *One in 31: The long reach of American corrections.* Retrieved from http://www.pewtrusts.org/~/media/legacy/uploadedfiles/wwwpewtrustsorg/reports/sentencing_and_corrections/onein100pdf.pdf

Pew Charitable Trusts. (n.d.) One in 31 U.S. adults are behind bars, on parole or probation. Retrieved from http://www.pewtrusts.org/en/about/news-room/press-releases/0001/01/01/one-in-31-us-adults-are-behind-bars-on-parole-or-probation

Smith, P., Goggin, C., & Gendreau, P. (2002). *The effects of prison sentences and intermediate sanctions on recidivism: General effects and individual differences.* Retrieved from Public Safety Canada website: http://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/ffcts-prsn-sntncs/index-en.aspx

Spelman, W. (1995). The severity of intermediate sanctions. *Journal of Research in Crime & Delinquency, 32,* 107–135. http://dx.doi.org/10.1177/0022427895032002001

United States Courts. (2013, July 18). Supervision costs significantly less than incarceration in federal system. Retrieved from http://www.uscourts.gov/news/2013/07/18/supervision-costs-significantly-less-incarceration-federal-system

Washington State Institute for Public Policy. (2016, June). Benefit-cost results. Retrieved from http://www.wsipp.wa.gov/BenefitCost?topicId=2

Wodahl, E. J., Ogle, R., Kadleck, C., & Gerow, K. (2009). Offender perceptions of graduated sanctions. *Crime & Delinquency, 59,* 1185–1210. http://dx.doi.org/10.1177/0011128709333725

Wood, P. B., & Grasmick, H. G. (1999). Toward the development of punishment equivalencies: Male and female inmates rate the severity of alternative sanctions compared to prison. *Justice Quarterly, 16,* 19–50. http://dx.doi.org/10.1080/07418829900094041

Wood, P. B., & May, D. C. (2003). Racial differences in perceptions of the severity of sanctions: A comparison of prison with alternatives. *Justice Quarterly, 20,* 605–631. http://dx.doi.org/10.1080/07418820300095631

